# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

CHRIS WITT, JR.,
     Plaintiff,

      vs.

COMMISSIONER OF
SOCIAL SECURITY,
     Defendant.

Case No. 1:19-cv-651
McFarland, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff Chris Witt, Jr., brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI").  This matter is before the Court on plaintiff's Statement of Errors (Doc. 12) and the Commissioner's response in opposition (Doc. 18).

## I.  Procedural Background

Plaintiff filed an application for DIB in December 2015 and for SSI in July 2017, alleging disability since December 7, 2015 due to bipolar disorder, borderline personality disorder, panic disorder, and agoraphobia.  Plaintiff, through counsel, requested and was granted a *de novo* hearing before administrative law judge ("ALJ") Renita Bivens.  Plaintiff and a vocational expert ("VE") appeared and testified at the ALJ hearing on April 3, 2018.  On August 9, 2018, the ALJ issued a decision denying plaintiff's DIB and SSI applications.  This decision became the final decision of the Commissioner when the Appeals Council denied review on June 10, 2019.

## II. Analysis

### A.  Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI).  The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)).  The claimant has the burden of proof at the first four

steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

### B.  The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. The [plaintiff] meets the insured status requirements of the Social Security Act through March 31, 2019.
>
> 2. The [plaintiff] has not engaged in substantial gainful activity since December 7, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3. The [plaintiff] has the following severe impairments: affective disorder, posttraumatic stress disorder, anxiety disorder and major depressive disorder (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5. After careful consideration of the entire record, [the ALJ] finds that the [plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations. The [plaintiff] is able to understand, remember and carry out simple instructions and low-level detailed instructions that are not fast-paced. The [plaintiff] is able to adapt to routine changes where duties are static in work process and major changes are explained in advanced (sic). The [plaintiff] is able to interact with the public and co-workers occasionally on a superficial basis such that any interpersonal interaction is limited to the work being performed. The

3

[plaintiff] can have occasional interaction with [a] supervisor or no more than one third of the workday.  Due to medical conditions and symptoms, the [plaintiff] would be off task 8 percent of the work period.

6. The [plaintiff] is capable of performing past relevant work as a Counter Clerk, Laundry/Dry Cleaning, Pet Clerk, Furniture/Hardware Assembler and Stocker. This work does not require the performance of work-related activities precluded by the [plaintiff]'s residual functional capacity (20 CFR 404.1565 and 416.965).

7. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from December 7, 2015, through the date of [the ALJ's] decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 17-29).

### C.  Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

4

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination.  Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D.  Record Evidence**

**1.  Mental health treatment history**

Plaintiff sought mental health treatment with Solutions Community Counseling (Solutions) on December 15, 2015, where plaintiff reported he had been a client previously.  (Tr. 345).  He reported that he was filing for disability benefits, his attorney had encouraged him to return to therapy, and he wanted to return to therapy because he found it to be helpful.  (*Id.*). Plaintiff was assessed with borderline personality disorder per history and bipolar disorder, current episode depressed, moderate.  (Tr. 351).  Therapy recommendations were made to decrease symptoms of depression and anxiety and stabilize mood.  (Tr. 351-52).

Plaintiff was initially evaluated by Lauren Mente, CNP, at Solutions on March 21, 2016. (Tr. 368-74).  She saw plaintiff for medication management.  Plaintiff reported a history of having "struggled with psych[iatric symptoms] since his teens" and receiving "[treatment] on and off for years."  (Tr. 368).  He described his symptoms as depression, mood swings,

irritability, "lots of ups and downs," history of anger problems with both verbal and physical outbursts, and a history of panic attacks and generalized anxiety.  At the time of this evaluation, plaintiff reported that he suffered "a few panic attacks per month" and mild auditory hallucinations.  On mental status examination, his mood was severely depressed and irritable and moderately anxious and angry.  (Tr. 370).  Affect was mildly constricted and flat.   He demonstrated moderate memory impairment and mild attention/concentration impairment.  Ms. Mente assessed plaintiff with bipolar disorder, current episode depressed, moderate; borderline personality disorder; and panic disorder without agoraphobia.  (Tr. 371).  Ms. Mente prescribed Trileptal and recommended additional therapeutic interventions.  (*Id.*).

Plaintiff was hospitalized from October 10 to 14, 2016 for treatment of recurrent major depression, posttraumatic stress disorder (PTSD), and borderline personality disorder.  (Tr. 595-620).  He was seen and evaluated by a multidisciplinary treatment team.  (Tr. 595).  His primary complaints included "agitation, anxiety, anxiety attacks, avoidance of crowds, concern about health problems, depression worse, difficulty sleeping, fear of going crazy, fear of impending doom, fearfulness, feeling depressed, feeling suicidal, financial problems, flashbacks, increased irritability, poor concentration, relationship difficulties, stressed at work, tearfulness and trauma recollections" with gradual worsening of symptoms since onset several months prior.  (Tr. 596).  He was prescribed Lamictal for mood stabilization, Lorazapam, Risperdal for "mood, sleep and anger," and Topamax for "weight loss and mood."  (Tr. 596-97).

When plaintiff saw Ms. Mente a few days after his discharge, he reported that the medication changes were helpful, his depression had "lifted a little," his anxiety was much

improved, and his mood was "fairly good." (Tr. 698). Ms. Mente adjusted plaintiff's medications. (Tr. 698-99). When seen by Ms. Mente in November 2016, plaintiff reported his depression was improving but he described auditory hallucinations, fair moods, some issues with impulsiveness ("bad verbal argument with his sister"), and "lots of anxiety and pre-panic attacks." (Tr. 695). Mental status examination findings were normal except for anxious mood and flat affect. Ms. Mente did not change plaintiff's medications because she wanted to give Lamictal some time to work. (Tr. 692-95).

Ms. Mente completed a form for Butler County Department of Job & Family Services on December 19, 2016. (Tr. 621/1067). She opined that plaintiff was unable to work due to bipolar disorder and panic disorder causing clinically significant impairment of plaintiff's ability to function in social and occupational settings, communicate with others, and perform tasks. (Tr. 621). Ms. Mente also submitted a letter on that date indicating that plaintiff was disabled effective December 19, 2016 through December 18, 2017. (Tr. 622).

According to a mental health transfer summary dated February 17, 2017, plaintiff was to be transferred within Solutions to begin receiving treatment at an increased level of care termed "SPMI" (serious and persistent mental illness). (Tr. 680). Although plaintiff's overall progress in treatment was "improved," he had not met his goals. (*Id.*).

When Ms. Mente saw plaintiff on November 28, 2017, she noted that he had undergone gastric sleeve surgery on April 17, 2017 and had lost a total of 105 pounds since November 2016. (Tr. 922). Plaintiff reported continued anxiety and paranoia and "bad" depression. (*Id.*). Ms. Mente found that plaintiff did not deal with any type of stressors well and became panicky

and almost unable to function.  He felt helpless and stated he could not even function sufficiently to figure out where to begin with housing paperwork in preparation for an anticipated move. Any type of stressor such as having to fill out paperwork was very upsetting and caused extreme anxiety.  He struggled with panic attacks and going to different public places.  He was paranoid about leaving his home and found it difficult to do so, and he feared leaving home without his mother.  On mental status examination, plaintiff was disheveled and his affect was flat.  (Tr. 924).  Ms. Mente indicated that his primary diagnosis was worsening.  (Tr. 926).  Her treatment plan was to increase Lamictal and add a new diagnosis of agoraphobia with panic disorder.  (Tr. 926-27).

Ms. Mente wrote a letter dated November 28, 2017, reporting that plaintiff presently received therapy, case management, and pharmacological management services at Solutions. (Tr. 885).  She wrote that she had added the diagnosis of agoraphobia with panic disorder on that date to his current diagnoses of bipolar I disorder, current episode depressed, moderate severity and borderline personality.  Ms. Mente wrote that plaintiff's symptoms caused "clinically significant impairment in his ability to function in social and occupational areas of functioning."  (*Id.*).

On January 30, 2018, Ms. Mente completed a Mental Impairment Questionnaire.  (Tr. 978-83).  She indicated that she had seen plaintiff once every one to two months between March 21, 2016 and January 30, 2018.  (Tr. 978).  He received medication management, therapy, and case management services.  His medication side effects included sedation, weight gain, and grogginess.  She opined that his prognosis was "fair, depending on compliance with treatment

and medications."  His symptoms included anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with weight change; decreased energy; thoughts of suicide; feelings of guilt or worthlessness; generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; persistent disturbances of mood or affect; emotional withdrawal or isolation; bipolar syndrome with a history of both manic and depressive episodes; hallucinations; and emotional lability.  (Tr. 979).

Ms. Mente assessed plaintiff's mental abilities and aptitudes needed to do unskilled work. She opined that plaintiff had no useful ability to function in the areas of maintaining regular attendance; being punctual within customary, usually strict tolerances; and completing a normal workday and work week without interruptions from psychologically-based symptoms.  (Tr. 980). She also found that plaintiff was unable to meet competitive standards in remembering work-like procedures; understanding, remembering, and carrying out very short and simple instructions; maintaining attention for two-hour segments; sustaining an ordinary routine without special supervision; responding appropriately to changes in a routine work setting; dealing with normal work stress; and being aware of normal hazards and taking appropriate precautions.  (Tr. 980). As the basis for these limitations, Ms. Mente explained that plaintiff last worked in December 2015 and he suffered from ongoing severe depression, anxiety, suicidal thoughts, agoraphobia, easy distractibility, and inability to concentrate.  She indicated that treatment was ongoing with medication adjustments and therapy.

Ms. Mente also opined that plaintiff had impairments in the mental abilities and aptitudes needed to do semiskilled and skilled work.  (*Id.*).  Ms. Mente opined that plaintiff was seriously

9

limited, but not precluded, in his ability to understand, remember, and carry out detailed instructions and set realistic goals or make plans independently of others.  (*Id*.).  She opined that plaintiff was unable to meet competitive standards in the area of dealing with the stress of semiskilled and skilled work.  To support these limitations, Ms. Mente explained that plaintiff had "[o]ngoing [symptoms] of anxiety, depression, agoraphobia.  Clinical depression to the extent that [he] is not able to leave his home for days [at] a time."  (*Id*.).  Finally, Ms. Mente opined that plaintiff had the following limitations in the mental abilities and aptitudes needed to do particular types of jobs: seriously limited but not precluded in his ability to interact appropriately with the general public; maintain socially appropriate behavior; and use public transportation.  (Tr. 981).  She opined that plaintiff was unable to meet competitive standards in his ability to adhere to basic standards of neatness and cleanliness.  Ms. Mente explained that plaintiff had severe anxiety which continued to cause problems with interacting with the public and he also had symptoms of agoraphobia.  (*Id*.).  Ms. Mente opined that plaintiff would miss more than four days of work per month due to his impairments or treatment.  (Tr. 983).

### 2.  Consulting evaluating psychologist Dr. Vonderhaar

Dr. William Vonderhaar, Ph.D., examined plaintiff for disability purposes on February 8, 2016.  (Tr. 702-08).  Plaintiff complained that his last job ended in December of 2015 because he had a "disagreement with the boss," and he added that many of his periods of employment in the past had ended because of disagreements or arguments with supervisors or coworkers.  (*Id.*).  Plaintiff reported that he had been hospitalized for psychiatric reasons at least ten times.  (Tr. 703).  He estimated that he had held 30 different jobs in his life.  (Tr. 704).  He reported that he

10

had been jailed at least three different times on domestic violence charges related to various physical altercations with live-in boyfriends.  He reported that he had panic attacks and could act impulsively, which led him to verbally attack people and had led to many job losses.  (Tr. 703). At the time of the evaluation, he was not taking any prescribed medications.  (Tr. 706).

On mental status examination, plaintiff did not demonstrate signs of anxiety, tension, nervousness, frustration, resentment, sadness, depression, or crying behavior.  (Tr. 705).   Dr. Vonderhaar found that plaintiff was cooperative throughout the evaluation, he did not display signs of behavioral abnormalities, and there were no signs of acute mental illness.  (Tr. 707).  Dr. Vonderhaar opined that plaintiff demonstrated symptomology suggestive of persistent depressive disorder (dysthymia), which was his final diagnosis.  (Tr. 707, 708).   Dr. Vonderhaar concluded that plaintiff's mental ability to relate to others, including fellow workers and supervisors, could be considered to be "negatively influenced"; his ability to understand, remember, and follow instructions did not appear to be negatively influenced; he would be able to understand and remember to follow simple instructions for any task that he felt motivated and interested in performing; his ability to maintain attention, concentration, persistence, and pace to perform routine tasks could be negatively influenced at times, and in particular plaintiff's ability to maintain persistence and pace to perform routine tasks may depend on his level of motivation and interest in a particular vocational endeavor; and plaintiff's ability to withstand the stress and pressures associated with day-to-day work activity may, at times, be negatively influenced.  (Tr. 707-08).

11

### 3. State agency reviewing psychologists, Drs. Hill and Malloy

State agency psychologist Mary K. Hill, Ph.D., reviewed plaintiff's file in February 2016 and concluded that he was mildly restricted in activities of daily living; experienced moderate difficulties in maintaining social functioning; had moderate difficulties in maintaining concentration, persistence, or pace; and had experienced no episodes of decompensation of extended duration. (Tr. 84). Dr. Hill found that plaintiff's reports of problems with concentration were not consistent with his performance at the consultative evaluation and that the medical evidence of record showed plaintiff had adequate memory and concentration. (Tr. 85). Dr. Hill found that plaintiff would be capable of completing 3 to 4-step tasks in an environment that has flexible production standards and schedules, and he retained the capacity to interact superficially with the general public, co-workers, and supervisors. (Tr. 87). She found that plaintiff should work in jobs where the duties are relatively static and changes can be explained ahead of time, and major changes would need to be gradually implemented to allow him to adjust. (Tr. 87). State agency psychologist, Kathleen Malloy, Ph.D., affirmed Dr. Hill's assessment upon reconsideration in May 2016. (Tr. 98-102).

### E. Specific Errors

On appeal, plaintiff alleges that the ALJ erred by (1) failing to properly evaluate the medical opinions of plaintiff's treating mental health nurse practitioner, Lauren Mente, CNP, and (2) failing to take into account that plaintiff's symptoms varied over time. (Doc. 12).

### 1. The ALJ's evaluation of CNP Mente's opinions

#### a. Plaintiff's DIB application

Plaintiff alleges as his first assignment of error that the ALJ erred by giving Ms. Mente's opinions "little" weight. (Doc. 12). The Commissioner must consider evidence from all "medical sources," SSR 06-03p, 2006 WL 2329939, *1 (August 9, 2006), which refers to both "acceptable medical sources" and health care providers who are not "acceptable medical sources." *Id.* (citing 20 C.F.R. §§ 404.1502, 416.902)[1]; *Id.* at *4 (the Commissioner must "consider all of the available evidence in the individual's case record in every case"). Licensed physicians and licensed or certified psychologists are "acceptable medical sources." *Id.* at *1-2 (citing 20 C.F.R. §§ 404.1513(a), 416.913(a)).[2] Under the Social Security regulations, "a written report by a licensed physician [or psychologist] who has examined the claimant and who sets forth in his report his medical findings in his area of competence . . . may constitute substantial evidence . . . adverse to the claimant" in a disability proceeding. *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 713 (6th Cir. 2013) (quoting *Richardson,* 402 U.S. at 402). In addition, the

---

[1] SSR 06-03p has been rescinded in keeping with amendments to the regulations that apply to claims filed on or after March 27, 2017, and the rescission is effective for claims filed after that date. 82 FR 15263-01, 2017 WL 1105348 (March 27, 2017). Sections 404.1502 and 416.902 were amended effective March 27, 2017, after plaintiff filed his claim for DIB and before plaintiff filed his claim for SSI. Under the regulations as amended effective March 27, 2017, a nurse practitioner is considered an "acceptable medical source." *See* 20 C.F.R. §§ 404.1502 (a)(7), 416.902(a)(7) (March 27, 2017). *See also Sutton v. Berryhill*, 358 F. Supp. 3d 162, 168 n. 4 (D. Mass. 2019). Because plaintiff's DIB claim was filed before the effective date of the rescission, SSR 06-3p and former § 404.1502 apply to his DIB claim. SSR 06-03p does not apply to plaintiff's SSI claim, which was filed after the effective date of the rescission, and that claim is governed by § 416.902 as amended. Plaintiff's SSI claim is therefore addressed separately *infra*.

[2] Sections 404.1513 and 416.913 were amended effective March 27, 2017. The prior version of § 404.1513 applies to plaintiff's DIB claim filed in 2015. For claims filed on or after March 27, 2017, including plaintiff's SSI claim filed in July 2017, all medical sources, not just acceptable medical sources, can make evidence that the Social Security Administration categorizes and considers as medical opinions. 82 FR 15263-01, 2017 WL 1105348 (March 27, 2017).

13

opinions of non-examining state agency medical and psychological consultants are weighed in accordance with the factors listed under 20 C.F.R. § 404.1527(c).

A certified nurse practitioner like Ms. Mente is not an "acceptable medical source" under former § 404.1513, but instead she is a "medical source" who falls into the category of "other source." 20 C.F.R. § 404.1513(d)(1); *see also* SSR 06-03p, 2006 WL 2329939, at *2 (nurse practitioners are "'[m]edical sources' who are not 'acceptable medical sources'"). For claims filed prior to March 27, 2017, only "acceptable medical sources" as defined under 20 C.F.R. § 404.1513(a) can provide evidence which establishes the existence of a medically determinable impairment, give medical opinions, and be considered treating sources whose medical opinions may be entitled to controlling weight. SSR 06-03p, 2006 WL 2329939, at *2. Information from "other sources" cannot establish the existence of a medically determinable impairment, but information they give "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *Id.* Their opinions "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id*. at *3.

The same factors that apply to the evaluation of medical opinions of "acceptable medical sources" are also applicable to opinion evidence provided by "other sources." *Id*. at *4 (citing 20 C.F.R. 404 1527(d)). Factors to be considered in evaluating opinions from "other sources" who have seen the claimant in their professional capacities include how long the source has known the individual; how frequently the source has seen the individual; how consistent the opinion of the source is with other evidence; how well the source explains the opinion; whether the source

14

has a specialty or area of expertise related to the individual's impairment; and any other factors that tend to support or refute the opinion.  *Id*. at *4-5.  *See also Cruse v. Commissioner of Social Sec*., 502 F.3d 532, 541 (6th Cir. 2007).  Not every factor will apply in every case.  SSR 06-03p, 2006 WL 2329939, *5.  The ALJ "should *explain* the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case."  SSR 06-03p, 2006 WL 2329939, at *6 (emphasis added).

The fact that a medical opinion is from an "acceptable medical source" is one factor that may warrant giving greater weight to that opinion than the opinion of a "medical source" who is not an "acceptable medical source."  *Id*. at *5.  This is because "acceptable medical sources" are "the most qualified health care professionals."  *Id*. (citing 65 FR 34955, dated June 1, 2000).  But "it may be appropriate" under the facts of a particular case "to give more weight to the opinion of a medical source who is not an 'acceptable medical source' if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion."  *Id*. at *5.[3]

The ALJ gave Ms. Mente's assessments of plaintiff's mental impairments "little weight" on several grounds.  Initially, the ALJ properly found that Ms. Mente's December 2016 opinion that plaintiff was disabled and unable to work for at least one year starting on that date is an

---

[3] Mental health case managers also are not "acceptable medical sources" and instead fall into the category of "other sources."  *See former* 20 C.F.R. §§ 416.913(d), 404.1513(d) (effective Sept. 3, 2013 to March 26, 2017).

opinion reserved to the Commissioner under the applicable DIB regulation, and her November 2017 letter was a similar type of opinion.  (Tr. 24, citing 20 C.F.R. §§ 404.1527(d))[4] (opinions that a claimant is disabled are reserved to the Commissioner because they are "administrative findings that are dispositive of a case").  Second, the ALJ found that although she had a treating relationship with the plaintiff, Ms. Mente is not an "acceptable medical source" under the applicable rules and regulations.  (Tr. 24).  But although there are circumstances where the ALJ would be justified in affording a certified nurse practitioner's opinion less weight than the opinion of an "acceptable medical source," *see* SSR 06-03p, 2006 WL 2329939, at *5, the ALJ did not cite substantial evidence that supports giving the January 2018 opinion of Ms. Mente, plaintiff's long-term treating mental health care provider, "little weight" based on her relative qualifications or any of the other reasons that the ALJ cited.

First, the ALJ found that Ms. Mente's opinions "appear extreme in consideration of [plaintiff's] appearance at the consultative examination; his acknowledgement of his ability to perform activities of daily living; the stabilization of his symptoms after his hospitalization in December 2016; his statements that his more recent lack of personal care were [sic] not related to his depression; his described activities (going to the gym twice per week and taking a trip with his sister)"; and other providers' objective findings of euthymic mood and normal orientation, memory, and concentration.  (Tr. 24-25).  Second, the ALJ found that that Ms. Mente's assessment was inconsistent with mental status findings from a 2018 examination by Ms. Mente and with the opinion of another mental health treatment provider at Butler Behavioral Health

---

[4] The ALJ also incorrectly cited 20 C.F.R. § 416.927(d) for this proposition.  (Tr. 24).  Section 416.927(d) does not apply to plaintiff's SSI claim filed after March 27, 2017.  Instead, as discussed *infra*, the rules in § 416.920c apply.  20 C.F.R. § 416.920c.

Services (BBHS) that plaintiff did not meet the criteria for bipolar disorder. (Tr. 25). Third, the ALJ found that Ms. Mente's assessments were inconsistent with the "overall examinations" of the physicians who saw plaintiff for treatment of his physical impairments. (Tr. 25). However, while the ALJ gave several reasons for giving Ms. Mente's January 2018 opinion "little" weight, the record considered as a whole does not substantially support the ALJ's decision.

Initially, the ALJ found that Ms. Mente's opinions "appear extreme in consideration of [plaintiff's] appearance at the consultative examination" of one-time examining psychologist Dr. Vonderhaar in February 2016, very soon after the alleged onset date and before plaintiff began treating with Ms. Mente. (Tr. 702-08). The ALJ did not reasonably rely on a snapshot of plaintiff's mental health from Dr. Vonderhaar's one-time evaluation to discount Ms. Mente's assessment, which she formulated after regularly treating plaintiff for nearly two years. "Since the level of functioning at any specific time may seem relatively adequate or, conversely, rather poor, proper evaluation of plaintiff's mental impairments must take into account variations in levels of functioning in determining the severity of [his] impairments over time." *Bostick v. Commr. of Soc. Sec.*, No. 1:16-cv-849, 2017 WL 3495258, at *11 (S.D. Ohio Aug. 15, 2017) (Litkovitz, M.J.) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(D)(2)), *report and recommendation adopted,* 2017 WL 4129645 (S.D. Ohio Sept. 15, 2017) (Black, J.). The ALJ did not consider plaintiff's appearance at Dr. Vonderhaar's examination in light of the entire record showing that plaintiff required psychiatric hospitalization, a higher level of care for persistent and serious mental illness, and adjustments to his medications during the subsequent years of treatment by Ms. Mente. It was not reasonable for the ALJ to rely on plaintiff's

17

appearance at Dr. Vonderhaar's one-time examination in February 2016, prior to the date plaintiff first saw Ms. Mente, to discount the treating provider's assessment issued two years later.

Second, the ALJ did not reasonably rely on Ms. Mente's findings from one mental status examination in March 2018 to discount the treating mental health provider's assessment of plaintiff's mental functioning. (Tr. 25, citing Tr. 1039-41). The ALJ determined that those findings showed that plaintiff "retained most of his functionality" and that his "primary diagnosis [was] stable." (*Id*.). The ALJ took into account the normal findings from that examination but failed to acknowledge the abnormal findings that Ms. Mente made on that same date. These included findings that plaintiff appeared disheveled and his affect was flat and depressed. (Tr. 1039). Nor did the ALJ acknowledge that Ms. Mente concluded that plaintiff's agoraphobia was worsening and she increased his dose of hydroxyzine, an anti-anxiety medication.[5] (Tr. 1041).

Further, the ALJ did not consider the results of this one mental status examination in the context of the numerous other findings Ms. Mente made over the course of two years of treating plaintiff. Ms. Mente's treatment records disclose that her mental health examinations consistently yielded abnormal findings that the ALJ neglected to consider when evaluating Ms. Mente's January 2018 assessment. These findings are consistent with Ms. Mente's assessment of debilitating mental limitations and, when read as a whole and in conjunction with the remaining evidence of record, do not substantially support the ALJ's finding that Ms. Mente's opinion was unsupported. (Tr. 25).

---

[5] *See* https://www.mayoclinic.org/drugs-supplements/hydroxyzine-oral-route/proper-use/drg-20311434?p=1.

The treatment records disclose that at his initial evaluation with Ms. Mente at Solutions in March 2016, plaintiff appeared unkempt and he reported mild auditory hallucinations.  (Tr. 368-74).  On mental status examination, his mood was severely depressed and irritable, he was moderately anxious and angry, and his affect was mildly constricted and flat.  His memory was moderately impaired and his attention/concentration was mildly impaired.

Plaintiff was subsequently hospitalized from October 10 to 14, 2016, for treatment of major depression, PTSD, and borderline personality disorder.  (Tr. 595-620).  Plaintiff reported a history of six inpatient psychiatric admissions with the most recent having occurred in 2010.  He presented with an increased sense of worthlessness and suicidal ideation with a plan to overdose, and he reported anhedonia, mild auditory hallucinations, and mild paranoia of neighbors.  (Tr. 620).  When examined on October 13, 2016, his mood was depressed, his affect range was restricted, and his affect reactivity was blunted.  Plaintiff was prescribed risperidone for mood, anger and sleep, Lamictal 25 mg for mood stabilization, Lorazepam for anxiety, and Topamax twice daily for mood augmentation and weight loss.  (Tr. 596).  Plaintiff reported prior to discharge that he believed the medication had helped his impulsive anger, but he still had concerns about it.  (Tr. 611).  On mental status examination, his mood was depressed, range was constricted, and reactivity was blunted.  (Tr. 612).

Following his hospitalization, plaintiff reported to Ms. Mente that the medication changes made during his hospitalization were helpful, his depression had lifted a little, and his anxiety was much improved.  (Tr. 698).  On mental status examination, his mood was depressed and his affect was flat.  (Tr. 698-99).  In November 2016, plaintiff reported to Ms. Mente that his

depression was better but he continued to have auditory hallucinations; he had some issues with impulsiveness; and he was having "lots of anxiety and pre-panic attacks" but was using Ativan only a few times per week per Ms. Mente's recommendation.  (Tr. 695).  On mental status examination, findings were mostly normal but his mood was anxious and his affect was flat.  (*Id*.).  Plaintiff reported later that month that he had been having a lot of anxiety due to his neighbors, but since the weather had turned colder they were not out as much.  (Tr. 692).  He continued to have auditory hallucinations, but Ms. Mente wanted to give Lamictal some time to work rather than adjust his medications.  (*Id*.).

Ms. Mente opined in December 2016 that plaintiff's diagnosed conditions of bipolar disorder and panic caused clinically significant impairment in his ability to function and perform tasks in social and work settings and to communicate with others, which rendered him unable to work, attend school, or complete community service from December 2016 to 2017.  (Tr. 621-22).  In February 2017, plaintiff was transferred to a higher care level at Solutions and assigned a case manager, Brittany Martin.  (Tr. 680).  Plaintiff reported being more moody and irritable lately as well as impatient; his depression was fair; he had been started on the medication BuSpar two weeks earlier due to increased anxiety; and on mental status examination, his mood was anxious and his affect was slightly flat and slightly anxious.  His BuSpar dose was increased to 10 mg twice daily.  (Tr. 677)

In July 2017, plaintiff reported worsening depression and anxiety.  (Tr. 641).  He was struggling to get out of bed and his personal hygiene was suffering.  He was having some suicidal thoughts at times and some issues with anger, and he was "easily irritable."  On mental

status examination, he had poor eye contact and his affect was flat and depressed.  (Tr. 642-43).

Ms. Mente indicated that plaintiff had worsening bipolar disorder and panic disorder without

agoraphobia.  (Tr. 644).  She increased the BuSpar dose to 20 mg twice daily.  (Tr. 645).

In August 2017, plaintiff complained of worsening depression and reported he was

having a difficult time getting out of bed and out of the house.  (Tr. 631).  He felt that his

personal hygiene was suffering because of his symptoms.  He stated that he walked his dog twice

daily for 15 minutes in a field behind his house where there were no other people, indicating he

could not walk in areas where other people were due to his high level of anxiety.  He reported he

had one panic attack since his last visit two weeks earlier on July 23, occasional suicidal

thoughts, and worse memory problems.  (*Id*.).  On mental status examination, he had poor eye

contact, his appearance was disheveled, and his affect was flat and depressed.  (Tr. 632-33).  Ms.

Mente opined that plaintiff's primary diagnosis of bipolar disorder was worsening, and his panic

disorder without agoraphobia was stable.  (Tr. 634).  She increased plaintiff's Risperdal for

bipolar depression.   (Tr. 635).

In November 2017, plaintiff reported that an increase in Risperdal was not helpful and a

prior increase in BuSpar was only mildly helpful, and he continued to have a lot of anxiety and

paranoia.  (Tr. 934).  He went into a panic-like state when door to door salesmen came to his

home.  He was anxious and did not want to leave his house.  He avoided going to the store and

had his family shop for him if possible.  He tried to have his mom walk the dog to avoid going

outside.  He was having frequent suicidal thoughts but without plan or intent.  (*Id*.).  On mental

status examination, his affect was flat and depressed.  (Tr. 936).  Ms. Mente found that his

21

bipolar disorder and panic disorder without agoraphobia were worsening, and she would consider a diagnosis of agoraphobia.  (Tr. 937-38).  She increased BuSpar to 30 mg twice daily. (Tr. 938).

Later than month, Ms. Mente reported that plaintiff had undergone gastric sleeve surgery in April 2017 and had lost 105 pounds since November 2016.  (Tr. 922).  He felt that an increase in BuSpar at his last visit had made little difference.  He wanted to move to a different county, but he felt hopeless and could not function enough to figure out where to begin with housing paperwork.  Plaintiff did not deal with any type of stressors well; he became panicky and almost unable to function; any type of stressor such as needing to fill out paperwork was very upsetting and caused extreme anxiety; and he struggled with panic attacks and found it difficult to leave his house.  (Tr. 923).  He was paranoid about leaving his house and feared leaving it without his mother.  He would go into a panic very quickly if he could not see his mother when out in public. He was seeing a therapist, Gretchen Meyers, PCC, once to twice weekly.  (Tr. 922-23).  On mental status examination, his appearance was disheveled.  (Tr. 924).  His affect was flat.  (Tr. 924).  His bipolar disorder was assessed as worsening.  (Tr. 925-26).  A new diagnosis of agoraphobia with panic disorder was added.  (Tr. 926).  As of November 28, 2017, plaintiff's diagnoses included agoraphobia with panic disorder; bipolar I disorder, current episode depressed, moderate severity; agoraphobia with panic disorder; and borderline personality.  (Tr. 885).  Ms. Mente opined that his symptoms caused clinically significant impairment in his ability to function in social and occupational areas of functioning.  (*Id*.).

In January 2018, Ms. Mente reported that plaintiff's severe anxiety and depression continued. (Tr. 1055). He reported his agoraphobia was "really bad" and his anxiety was making it hard to leave the house. Risperdal caused sedation, which was tolerable. His mother was present during the evaluation and reported that plaintiff's depression seemed slightly improved. He had panic attacks every time he left the house and was not able to leave without a family member by his side. He had ongoing problems with difficulty concentrating. (*Id.*). On mental status examination, he appeared disheveled and his affect was flat and depressed. (Tr. 1058). Ms. Mente assessed his agoraphobia as worsening and his bipolar disorder as stable. (Tr. 1060).

In February 2018, after plaintiff transferred from Ms. Meyers to a new individual therapist, Ntatu North, MFT, plaintiff reported that he had stopped associating with people other than his mother and his sister because he got "into trouble" when he was with other people. (Tr. 1045-47). During a needs assessment by his case manager that same month, plaintiff reported that he needed to work on his personal hygiene, which plaintiff stated he did not think he had been neglecting because he was depressed but because he had nothing to do. (Tr. 1053). Plaintiff's case manager educated plaintiff about creating a hygiene chart.

In March 2018, Ms. Mente reported that plaintiff had complained about "ongoing severe anxiety and depression" at his last visit. (Tr. 1036). A trial of the medication hydroxyzine did not provide any relief. Plaintiff reported that he was more easily distracted, and this was significantly worse during periods of higher anxiety. Symptoms of agoraphobia continued and he had panic attacks almost every time he left the house. He did not think he could leave the

23

house without his mother at his side. He was having nightmares about mowing the grass, which was his responsibility, and his anxiety got much worse as the weather got warmer. He continued to have problems with motivating and with "going days without showering." He was having suicidal thoughts at times but without any specific plans or intent. (*Id*.). On mental status examination, he appeared disheveled and his affect was flat and depressed. (Tr. 1039). Ms. Mente diagnosed his bipolar disorder as stable and his agoraphobia as worsening. (Tr. 1041). She increased the dosage of hydroxyzine as needed for anxiety/panic attacks. (Tr. 1041).

Thus, while Ms. Mente's treatment records disclose some normal findings, they also consistently show numerous abnormal mental status examination findings and other evidence of debilitating mental health symptoms that the ALJ neglected to consider when evaluating Ms. Mente's assessment of plaintiff's mental functioning. The ALJ did not take into account the abnormal findings Ms. Mente consistently documented in her treatment notes, but instead the ALJ chose select portions of the medical record to discredit Ms. Mente's assessment and failed to perform a proper analysis of the medical evidence under agency regulations and controlling case law. *See Germany-Johnson v. Commissioner of Social Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (the ALJ's non-disability finding was not supported because, among other reasons, the ALJ cited only "normal" findings of two non-treating doctors to "refute the severity of the claimant's diagnoses" and "was selective in parsing the various medical reports"). Ms. Mente's treatment records, considered as a whole, corroborate her findings of debilitating mental health symptoms. The ALJ erred by relying on isolated findings from one treatment session to discount Ms. Mente's January 2018 assessment.

The ALJ also gave Ms. Mente's assessment "little" weight on the ground it was inconsistent with an opinion concerning plaintiff's correct diagnosis offered by a mental health treatment provider at BBHS.  (Tr. 25).  The ALJ found that the BBHS provider opined in September 2017 that plaintiff "did not meet criteria for bipolar disorder, as he is able to distinguish between mania and symptoms of PTSD."  (Tr. 25 citing Tr. 1005-06).  But the ALJ did not accurately construe the BBHS records.  BBHS counselors opined at plaintiff's initial comprehensive assessment in August 2017 that plaintiff did not "clearly" meet the criteria for bipolar disorder and they could not make an accurate diagnosis due to the similarity between the symptoms of mania and PTSD.  (Tr. 1005).  The ALJ did not explain why these providers' uncertainty about plaintiff's correct diagnosis should impact Ms. Mente's assessment of plaintiff's mental functioning.

The ALJ's focus on the correct diagnosis is especially puzzling since in evaluating plaintiff's DIB claim under the applicable regulations, the ALJ should have considered the opinions of the BBHS licensed professional counselors and licensed social workers only to the extent they showed the severity of plaintiff's impairments and shed light on how plaintiff's impairments affected his ability to work.  *See* SSR 06-03p; 20 C.F.R. § 404.1513(d).  *See also McKinney v. Commr. of Soc. Sec.*, No. 2:15-cv-2351, 2016 WL 1463992, at *7 (S.D. Ohio Apr. 14, 2016), *report and recommendation adopted,* 2016 WL 3097152 (S.D. Ohio June 3, 2016) (licensed professional counselors are not "acceptable medical sources" under the regulations); *Amer v. Commr. of Soc. Sec.*, No. 1:13-cv-282, 2014 WL 1338115, at *9 n. 8 (S.D. Ohio Apr. 2, 2014), *report and recommendation adopted,* 2014 WL 1670082 (S.D. Ohio Apr. 24, 2014)

(citing 20 C.F.R. §§ 404.1513(a), 416.913(a)) (licensed social workers are not "acceptable medical sources" and instead fall into the category of "other sources").  But rather than considering their findings and opinions for these purposes, the ALJ ignored information and findings in the BBHS comprehensive assessment related to plaintiff's mental functioning, including plaintiff's reports that he could not take trash out if neighbors were out because he did not want people to look at him or be around him due to his anxiety; that his depression made him miserable and he felt hopeless, he did not want to get out of bed, and he questioned everything that he had to do because he did not want to do any of it; he had difficulty taking showers; and he experienced auditory hallucination approximately once monthly and panic attack at least once weekly that lasted from 30 to 45 minutes.  (Tr. 1001).  The ALJ also did not consider BBHS findings that plaintiff's mood/affect was depressed and anxious, his thought process was racing with flight of ideas, and he did not make eye contact.  (Tr. 999).  By improperly focusing on whether plaintiff had been correctly diagnosed, the ALJ failed to consider evidence of plaintiff's mental functioning provided by other sources that appears to be consistent with Ms. Mente's assessment.

Further, the ALJ found that Ms. Mente's opinion was entitled to "little" weight in light of evidence that plaintiff's symptoms stabilized after his hospitalization in December of 2016.[6]  (Tr. 24).  Though plaintiff's symptoms may have stabilized briefly after his October 2016 hospitalization, evidence of sustained improvement in plaintiff's condition is lacking.  To the contrary, the record shows that plaintiff's level of care at Solutions was increased in February

---

[6] Plaintiff was hospitalized for mental health symptoms from October 10 to 14, 2016.  (Tr. 595-620).

26

2017 due to serious and persistent mental illness. (Tr. 680). Further, Ms. Mente continued to adjust plaintiff's medications over the ensuing months of treatment. *See* Tr. 698-99- medications were started during plaintiff's hospitalization in October 2016; Tr. 677- his BuSpar dose, which had been started two weeks earlier due to increased anxiety, was increased in December 2016; Tr. 645- BuSpar dose was increased to 20 mg twice daily in July 2017; Tr. 937-38 - BuSpar dose was increased to 30 mg twice daily in November 2017; Tr. 1041- hydroxyzine was increased in March 2018). In finding that plaintiff's condition was nonetheless stable, the ALJ selectively parsed the medical records to support her finding despite evidence to the contrary. *See Germany-Johnson,* 313 F. App'x at 777. The ALJ was not entitled to discount Ms. Mente's assessment based on an unsupported finding that plaintiff's medical condition had stabilized.

Next, the ALJ did not reasonably rely on the mental health findings and the "[o]verall examinations" of providers who treated plaintiff for his physical impairments to discount Ms. Mente's assessment of plaintiff's mental functioning. (Tr. 24-25). The ALJ found inconsistencies between Ms. Mente's January 2018 assessment and the routine mental health findings generated by plaintiff's doctors who treated him for his physical impairments, most of whom saw him only once, in 2016 and in May, August, and September 2017. (Tr. 25, citing Tr. 1011, 1016-17, 1025-26, 903-08, 1076-78). However, the ALJ did not explain why she credited the perfunctory findings of these providers over the findings of Ms. Mente, a specialist in mental health who saw plaintiff on a regular basis over an extended time period, even though Ms. Mente's findings appear to be consistent with plaintiff's psychiatric hospitalization in October 2016; his transfer to an increased level of care in February 2017 for serious and persistent mental

illness; his reports of increased symptoms; the mental status examination findings by both Ms.

Mente and BBHS; and the continued adjustments to plaintiff's medications.

Finally, the ALJ improperly construed evidence concerning plaintiff's ability to perform

activities of daily living and his described activities when evaluating Ms. Mente's assessment.

(Tr. 24; *see* Tr. 23, citing Tr. 624, 631, 675).   The ALJ found that plaintiff's reported symptoms

and limitations were inconsistent with his reports in August 2017 that he went to the gym with

his sister twice each week (Tr. 24); he had taken a trip with his sister (*Id*.); he was "working out"

and had been "doing a lot or walking" in May 2016 following knee surgery (Tr. 1080); and his

failure to take care of himself recently was not due to his mental health symptoms.  (Tr. 24-25).

The ALJ mischaracterized the evidence as inconsistent with plaintiff's reported difficulties in

leaving his house and being around other people due to his anxiety.  In fact, the records show

that in August 2017, plaintiff reported to Ms. Mente that he could only walk his dog in a field

behind his house where no other people were around due to his high level of anxiety.  (Tr. 631).

Plaintiff also reported in August 2017 that he had "started going to the gym with his sister" and

he was "open to" going there twice a week, but there is no indication that plaintiff was able to

attend the gym with his sister for any length of time and was ever actually able to go twice a

week.  (Tr. 628).  In fact, plaintiff reported during this same time frame "that his anxiety has

been really bad lately and he believes that's [due to] the weather improving.  [He] reported that

he's having panic attacks on a regular basis [due to] seeing more of the people coming out of

their house[s]."  (*Id*.).  Plaintiff also reported that he had been feeling "very depressed" for about

one month and his suicidal ideation had increased in frequency.  (Tr. 624).  Further, though the

28

ALJ suggested that plaintiff did not neglect his self-care due to his mental health symptoms because he disavowed this was the reason at one visit with his case manager (*see* Tr. 1053), the record consistently documents that plaintiff's appearance was unkempt or disheveled. (*See*, e.g., Tr. 370 - 3/21/2016; Tr. 632- 8/7/2017; Tr. 924, 11/28/2017; Tr. 1058- 1/30/2018; Tr. 1039, 3/6/2018). Plaintiff also acknowledged one month after he denied neglecting his self-care due to depression that his anxiety worsened as it got warmer out and he was "still having problems with motivating and going days without showering." (Tr. 1036). Thus, plaintiff's daily activities are not inconsistent with Ms. Mente's assessment of his mental functioning and do not substantially support the ALJ's decision to discount Ms. Mente's assessment.

Although the ALJ set forth numerous reasons for rejecting Ms. Mente's assessment of plaintiff's functional capacity, the Court determines that the ALJ's reasons are not supported by substantial evidence in the case record. Ms. Mente treated plaintiff on a regular basis, she consistently adjusted plaintiff's medications throughout the relevant time period, and she treated him in conjunction with other providers at Solutions at an increased level of care in an effort to ameliorate plaintiff's ongoing and serious mental health symptoms. The evidence shows that Ms. Mente's opinion was well-supported by her findings and other evidence in the record. Plaintiff's first assignment of error as it relates to his DIB claim should be sustained for these reasons.

### b. Plaintiff's SSI application

As indicated *supra*, the ALJ did not properly evaluate plaintiff's SSI claim under the correct rules and regulations. In determining that Ms. Mente's opinion was entitled to "little

weight," the ALJ found that Ms. Mente "is not an acceptable medical source" under 20 C.F.R. § 416.902 and that Ms. Mente's December 2016 opinion that plaintiff was disabled is a determination reserved to the Commissioner under 20 C.F.R. § 416.927(d). (Tr. 24). The ALJ erroneously applied these regulations to plaintiff's SSI claim. Section 416.902 was amended effective March 27, 2017, prior to the date plaintiff filed his claim for SSI benefits in July 2017. Under the regulation as amended, a nurse practitioner is considered an "acceptable medical source." *See* 20 C.F.R. § 416.902(a)(7) (March 27, 2017) (a "Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice" is an "[a]cceptable medical source" for SSI claims filed on or after March 27, 2017); *Sutton v. Berryhill*, 358 F. Supp. 3d 162, 168 n. 4 (D. Mass. 2019) (citing 20 C.F.R. § 404.1502(a)(7)) (a nurse practitioner is considered to be an "acceptable medical source" for claims filed on or after March 27, 2017"). Thus, for purposes of plaintiff's SSI claim, the ALJ erred by finding Ms. Mente was not an "acceptable medical source" and giving her opinion less weight on this basis.

Further, the ALJ erroneously applied 20 C.F.R. § 416.927 when evaluating plaintiff's claim for SSI. Section 416.927 applies to the evaluation of medical opinion evidence for SSI claims filed before March 27, 2017. The regulation does not apply to claims for SSI filed after that date. Instead, the rules set forth in 20 C.F.R. §§ 416.920b and 416.920c apply to claims for SSI filed after March 27, 2017. *See* 20 C.F.R. §§ 416.913, 416.920c.

Because the ALJ did not evaluate plaintiff's claim for SSI benefits under the correct regulations, the ALJ's decision denying plaintiff's SSI claim should not stand. *See Rabbers*, 582

F.3d at 651 (quoting *Bowen,* 478 F.3d at 746) ("a decision of the Commissioner will not be

upheld where the SSA fails to follow its own regulations and where that error prejudices a

claimant on the merits or deprives the claimant of a substantial right.").  Plaintiff's first

assignment of error as it relates to the ALJ's decision to deny his claim for SSI benefits should

be sustained.

**2.  Consideration of plaintiff's varying symptoms over time**

Plaintiff alleges as his second assignment of error that the ALJ erred by failing to

recognize that the severity of his symptoms fluctuated and by selectively citing records that

supported her findings that plaintiff's symptoms were less severe than he alleged.  (Doc. 12 at

21-22).  For the reasons discussed *supra*, plaintiff's second assignment of error is well-taken.  In

addition to relying on inapplicable regulations, the ALJ did not perform a proper analysis of the

medical evidence that supported plaintiff's claims for DIB and SSI and instead selectively parsed

the evidence to discredit Ms. Mente's assessment and find that plaintiff's mental impairments

were not disabling.  *See Germany-Johnson*, 313 F. App'x at 777.  Plaintiff's second assignment

of error should be sustained.

**III.  Conclusion**

In determining whether this matter should be reversed outright for an award of benefits or

remanded for further proceedings, the Court notes that all essential factual issues have not been

resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to

benefits as of his alleged onset date.  *Faucher v. Secretary of H.H.S.,* 17 F.3d 171, 176 (6th Cir.

1994).  This matter should be remanded for further proceedings, including reevaluation of the

treating nurse practitioner's opinion under the applicable regulations, reevaluation of the opinions of the other medical sources of record, and additional vocational and other testimony as warranted, consistent with this decision.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner be **REVERSED** and the matter be **REMANDED** for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: _____9/22/2020_____

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

CHRIS WITT, JR.,                                    Case No. 1:19-cv-651

      Plaintiff,                                  McFarland, J.
                                                    Litkovitz, M.J.
vs.

COMMISSIONER OF
SOCIAL SECURITY,

      Defendant.


**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).

33